**BROOKLYN LEGAL SERVICES CORP. B and Legal Services for New York City, on their own behalf and on behalf of their clients, et al., Plaintiff–Appellee–Cross–Appellants,**

Community Service Society of New York, Inc., et al., Plaintiff– Cross–Appellants,

Carmen Velazquez, et al., Plaintiffs,

v.

**LEGAL SERVICES CORPORATION, Defendant–Appellant–Cross– Appellee,**

United States of America, Intervenor– Defendant–Appellant–Cross– Appellee.

Docket Nos. 05–0340–cv (L), 05–0360–cv (CON), 05–0787–cv (CON), 05–0792–cv (CON), 05–0925–cv (XAP).

United States Court of Appeals, Second Circuit.

Argued Nov. 2, 2005.

Decided Sept. 8, 2006.

---

Stephen L. Ascher, New York, N.Y. (Alan Levine, Kronish Lieb Weiner & Hellman LLP, New York, NY, of counsel), for Defendant–Appellant–Cross–Appellee.

Matthew M. Collette, Washington, D.C. (Peter D. Keisler, Assistant Attorney General, Roslynn R. Mauskopf, United States Attorney, Barbara L. Herwig, Civil Division, U.S. Department of Justice, Washington, D.C., of counsel), for Intervenor–Defendant–Appellant–Cross–Appellee.

Burt Neuborne, Brennan Center for Justice, New York, N.Y. (Peter M. Fishbein, Joseph M. Drayton, Kaye Scholer LLP, New York, NY, on the brief; Laura K. Abel, David S. Udell, Rebekah Diller, Brennan Center for Justice at NYU School of Law, New York, NY, of counsel), for Plaintiff–Appellee–Cross–Appellants and Plaintiff–Cross–Appellants.

James D. Liss, New York, N.Y. (James H.R. Windels, James J. Duffy, Davis Polk & Wardwell, New York, NY, of counsel), filed a brief for the National Legal Aid & Defender Association, et al. as Amici Curiae.

Jonathan L. Hafetz, New York, N.Y. (Lawrence S. Lustberg, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, New York, NY, of counsel), filed a brief for the Council on Foundations, Inc., et al. as Amici Curiae.

James L. Quarles III, Washington, D.C. (Elizabeth A. Wilson, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Richard A. Johnston, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, of counsel), filed a brief for the National Association of Iolta Programs as Amicus Curiae.

Jason Brown, New York, N.Y. (George Kendall, Rachel Nash, Holland & Knight LLP, New York, NY, of counsel), filed a brief for the Association of the Bar of the City of New York, et al. as Amici Curiae.

Before CARDAMONE, McLAUGHLIN, and B.D. PARKER, Circuit Judges.

CARDAMONE, Circuit Judge.

When one of the cases of this consolidated appeal was before us seven years ago, we set out some guidance on the law, which the district court either misinterpreted or missed. If the latter, such forgetfulness is understandable because we know that even Homer nodded.[1]

We have before us an appeal and several cross-appeals from a preliminary injunction entered in the United States District Court for the Eastern District of New York (Block, J.) on December 21, 2004, and from an order modifying it entered on February 24, 2005. The appeals concern the constitutionality of federal restrictions on local legal assistance programs that receive federal funding through the Legal Services Corporation (LSC). The restrictions apply regardless of whether the recipients receive non-federal funds in addition to LSC funds, and prohibit recipients from, *inter alia*, participating in class action suits, seeking attorneys' fees, and personally soliciting clients.

Plaintiffs South Brooklyn Legal Services Corp. *et al.* include local legal assistance programs which provide legal services to low-income New Yorkers, as well as the programs' staff attorneys, clients, and donors. Defendant LSC is a federally-char-

---

1. A reference to the reappearance in Homer's famous "Iliad" and "Odyssey" of a character that the author had earlier in this lengthy Greek saga killed-off. This prompted the Roman poet Horace to write "quandoque bonus dormitat Homerus" (even the noble Homer sometimes nods). Horace, *Ars Poetica*, l.359.

tered nonprofit corporation that awards federal funds appropriated by Congress to recipient legal assistance programs. Congress has charged LSC with ensuring that the federal funds it distributes are not diverted by recipients toward activities Congress specifically desired *not* to subsidize. The United States has joined LSC as intervenor-defendant in these proceedings to defend the federal statute and regulation challenged by plaintiffs.

In the district court, plaintiffs sought a preliminary injunction against defendant LSC to prevent enforcement of portions of LSC's program integrity regulation, 45 C.F.R. § 1610.8, and § 504 of the Omnibus Consolidated Rescissions and Appropriations Act of 1996 (1996 Act), Pub.L. No. 104–134, 110 Stat. 1321 (1996). In partially granting injunctive relief the district court reasoned that the administrative and financial costs imposed on plaintiffs by LSC's application of the regulation created an undue burden on plaintiffs' right under the First Amendment to use non-federal funds to engage in constitutionally protected activity.

## BACKGROUND

### I Statutory Background—the Program Integrity Regulation

LSC is a federally-chartered nonprofit corporation created and funded by Congress to serve as a conduit for federal funds that are distributed to local legal assistance programs. 42 U.S.C. § 2996b(a); *see* Legal Services Corporation Act of 1974 (LSC Act), Pub.L. No. 93–355, 88 Stat. 378 (1974) (codified as amended at 42 U.S.C. §§ 2996–2996l). These recipient programs, like the ones included as plaintiffs to the present appeal, often receive funds from state and local governments and private sources in addition to funds received from Congress through LSC. *See* S.Rep. No. 104–392, at 2–3 (1996).

In 1996, facing mounting pressure to curtail some of the more controversial activities conducted by some recipient programs, *see id.* at 1–2, Congress enacted § 504 of the 1996 Act, which supplemented, and in some instances reinforced, the restrictions on LSC-fund recipients with more stringent requirements. *See also* Science, State, Justice, Commerce, and Related Agencies Appropriations Act, 2006, Pub.L. No. 109–108, tit. V, 119 Stat. 2290, 2331 (2005) (carrying forward restrictions to the present time). For example, three of the 1996 Act restrictions, which also happen to be challenged by plaintiffs in their cross-appeals, prohibit recipients from participating in class action lawsuits, seeking certain types of attorneys' fees, and in-person solicitation of clients. 1996 Act § 504(a)(7), (13), & (18); *see* 45 C.F.R. pts. 1617, 1638, & 1642.

Shortly following the 1996 Act's enactment, a district court in Hawaii enjoined LSC from enforcing the 1996 Act's restrictions "to the extent that they relate to the use of Non–LSC Funds." *Legal Aid Soc'y of Haw. v. Legal Servs. Corp. (LASH),* 961 F.Supp. 1402, 1422 (D.Haw.1997). The restrictions, as noted above, apply to LSC-fund recipients regardless of whether they also receive non-federal funds. The district court reasoned that because LSC, in implementing the 1996 Act's restrictions, had effectively foreclosed all avenues by which a recipient program could use *non-federal* funds to engage in constitutionally protected activities, the federal corporation had imposed an unconstitutional condition on the receipt of a federal subsidy. *See id.* at 1414–17.

To address the District of Hawaii's injunction, LSC promulgated the program integrity regulation. *See* Use of Non–LSC Funds, Transfers of LSC Funds, Program

Integrity, 62 Fed.Reg. 27,695, 27,697 (May 21, 1997) (codified at 45 C.F.R. § 1610.8). The new regulation created an avenue by which a recipient may "affiliate" with an organization that uses non-federal funds to engage in activities restricted by the 1996 Act, and was thus an attempt to cure any constitutional concerns raised by the *LASH* decision. *Id.*

Under the regulation, a recipient's relationship with an unrestricted affiliate organization is permissible, provided the recipient maintains "objective integrity and independence from [the] organization that engages in restricted activities." 45 C.F.R. § 1610.8(a). Objective integrity is achieved where the recipient (1) is a legally separate entity from the unrestricted affiliate organization, (2) refrains from transferring LSC funds to the unrestricted affiliate organization, and (3) maintains "sufficient physical and financial separation" from the unrestricted affiliate organization. *Id.* A recipient uncertain about whether its relationship with a restricted organization satisfies the regulation may "submit [to LSC] all the relevant 'program integrity' information and request a review by [LSC] of any existing or contemplated relationship with an organization that engages in restricted activities." *See* 62 Fed. Reg. at 27,698.

Determined to insulate the new rule from challenges such as those the District of Hawaii found persuasive, LSC designed the regulation to mirror another such program integrity regulation that had already survived similar constitutional challenges in the Supreme Court in *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). The endeavor was largely successful, for LSC's regulation has been upheld by every court to have encountered a challenge to its validity—including this one and the initially dubious district court in Hawaii. *See Velazquez v. Legal Servs.*

*Corp. (Velazquez II)*, 164 F.3d 757, 773 (2d Cir.1999), *aff'g in relevant part*, 985 F.Supp. 323 (E.D.N.Y.1997); *Legal Aid Soc'y of Haw. v. Legal Servs. Corp.*, 145 F.3d 1017, 1031 (9th Cir.1998), *aff'g in relevant part*, 981 F.Supp. 1288 (D.Haw. 1997).

## II   Prior Proceedings

### A.   *Velazquez I*

In 1997, several of the plaintiffs to this appeal, the so-called *Velazquez* plaintiffs, brought challenges on First Amendment grounds to the program integrity regulation and to certain of the 1996 Act's restrictions relating to a recipient's lobbying and welfare reform activities. *Velazquez v. Legal Servs. Corp. (Velazquez I)*, 985 F.Supp. 323 (E.D.N.Y.1997). The *Velazquez* plaintiffs alleged the program integrity regulation failed to cure the constitutional issues raised by the district court in Hawaii because the financial and administrative costs of forming a separate affiliate organization remained an unconstitutional condition on their use of non-federal funds. *See id.* at 337; *see also Velazquez II*, 164 F.3d at 765 ("Plaintiffs' ... constitutional contention is that the program integrity rules ... unreasonably burden a grantee's ability to use non-federal funds to engage in restricted activity."). The district court disagreed and the plaintiffs appealed to this Court.

### B.   *Velazquez II and III*

On appeal, we rejected the facial challenge to the regulation, holding that it did not impose an unconstitutional condition on the exercise of free speech rights. *See Velazquez II*, 164 F.3d at 766. We explained that "in appropriate circumstances, Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alternative channels for protected

expression." *Id.* Because the *Velazquez* plaintiffs had "provide[d] no basis for concluding that the program integrity rule[s] cannot be applied in at least some cases without unduly interfering with [a recipient's] First Amendment freedoms," we held that they could not sustain a facial challenge. *Id.* at 767.

However, we also noted in passing that the *Velazquez* plaintiffs "remain[ ] free to bring an as-applied challenge" and demonstrate that the program integrity rules "will, in the case of some recipients, prove unduly burdensome and inadequately justified, with the result that the 1996 Act and the regulations will suppress impermissibly the speech of certain funded organizations and their lawyers." *Id.*

Finally, we upheld as viewpoint neutral the 1996 Act's statutory restrictions that the *Velazquez* plaintiffs challenged, with the exception of one proviso, which we found viewpoint discriminatory and invalid on its face under the First Amendment. *Id.* at 770–72. Our invalidation and consequent severance of the proviso were ultimately affirmed by the Supreme Court in *Legal Servs. Corp. v. Velazquez (Velazquez III)*, 531 U.S. 533, 549, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001), but that Court declined to review the rest of our decision, in particular as it related to our judgment on the regulation, 532 U.S. 903, 121 S.Ct. 1224, 149 L.Ed.2d 135 (2001) (Mem.) (denying certiorari).

### III   Present Proceedings

Following the Supreme Court's decision in *Velazquez III*, the litigation leading to the present appeal commenced. Having returned to the district court from the halls of One First Street, the *Velazquez* plaintiffs decided to pursue the as-applied challenge to the regulation contemplated by our *Velazquez II* opinion. Meanwhile, a new set of plaintiffs had filed a second,

virtually identical action in the same district court, captioned *Dobbins v. Legal Servs. Corp.*, No. 1:01–CV–08371 (E.D.N.Y.2001), and the two actions were consolidated.

The joint plaintiffs sought a preliminary injunction against LSC's enforcement of both the 1996 Act and the program integrity regulation, raising the following challenges: (1) the as-applied challenge to the program integrity regulation under the First Amendment that was contemplated by *Velazquez II;* (2) a facial challenge to the regulation and the 1996 Act on a ground not raised in *Velazquez II*—that they violate "fundamental principles of federalism" under the Tenth Amendment; and (3) a facial challenge under the First Amendment to the 1996 Act's restrictions on class action litigation, attorneys' fees, and soliciting clients. The defendant LSC, joined by the United States, moved to dismiss all the claims as legally groundless. In addition, they moved to dismiss the as-applied challenge to the regulation for lack of standing because the plaintiffs asserting the challenge had never attempted to comply with the regulation.

To address the standing issue, plaintiffs submitted to LSC a proposal that attempted to comply with the regulation. This so-called "clarified proposal" described the level of separation that the plaintiffs believed LSC could impose consistent with the First Amendment. The clarified proposal would permit the plaintiffs and their affiliate organizations to operate in the same physical premises, utilizing accounting measures to allocate the costs between the LSC-funded plaintiff and its unrestricted affiliate organization. On June 24, 2003 LSC rejected the proposal, stating that the proposed 100% sharing of physical space, equipment and staffs demonstrates that the clarified proposal as a whole fails

to provide physical and financial separation as required by the regulation.

Following LSC's rejection of the clarified proposal, the district court ruled in favor of LSC on all of the plaintiffs' claims—except with regard to the as-applied challenge to the program integrity regulation on First Amendment grounds. As to that challenge, the court granted plaintiffs' preliminary injunction application, insofar as it requested that LSC be prevented from withholding federal funds if the plaintiffs substantially complied with the clarified proposal. The trial court believed the clarified proposal fully satisfied most of LSC's legitimate interests in ensuring that federal funds were not diverted by recipients toward activities banned by Congress. Moreover, the court reasoned, requiring a separation greater than that contemplated by the clarified proposal would impose, in contravention of *Velazquez II*, an "undue burden" on plaintiffs' ability to use non-federal funds for protected activities, since the financial and administrative costs on plaintiffs of maintaining physically separate offices and personnel would be substantial, while the government's interests in imposing them were not.

All parties appealed the district court's ruling.

## DISCUSSION

With this background in mind, we turn to the appeals before us. In reviewing a district court's decision on a motion for a preliminary injunction, we reverse only if there has been an abuse of discretion. Where the party seeking the injunction attempts to enjoin application of a governmental regulation, it must demonstrate irreparable harm should the injunction not be granted and a likelihood of success on the merits. *See Velazquez II*, 164 F.3d at

763; *Able v. United States*, 44 F.3d 128, 130–31 (2d Cir.1995) (per curiam).

## I Regulation: As–Applied Challenge

LSC appeals the district court's order granting the preliminary injunction with regard to the program integrity regulation on two separate grounds: first, that plaintiffs challenging the regulation lack standing; and second, that the district court erred in adopting the undue burden test, which in LSC's view is irrelevant to the analysis of whether the program integrity regulation violates the First Amendment. We discuss these two issues in order.

### A. Standing

LSC moves first to dismiss plaintiffs' complaint pursuant to Rule 12(b)(1) for lack of standing. LSC also states the plaintiffs' as-applied challenge is not ripe for review. However, rather than raise distinct arguments pertaining to ripeness, LSC blends into one its ripeness and standing arguments. Since the two doctrines are closely related, most notably in the shared requirement that the injury be imminent rather than conjectural or hypothetical, the conflation seems to us neither surprising nor inaccurate. *See Warth v. Seldin*, 422 U.S. 490, 499 n. 10, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Bach v. Pataki*, 408 F.3d 75, 82 n. 15 (2d Cir.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 1341, 164 L.Ed.2d 56 (2006); *Berger v. Heckler*, 771 F.2d 1556, 1562 n. 8 (2d Cir.1985).

Because LSC's ripeness arguments concern only that shared requirement—*i.e.*, LSC challenges the claim's ripeness on essentially the same grounds as those related to the plaintiffs' standing—it follows that our analysis of LSC's standing challenge applies equally and interchangeably to its ripeness challenge. We therefore do

not address ripeness separately, but consider it together with, and as part of, the standing inquiry. *See* 13A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3531.12 (2d ed. 1984) ("The blending of standing and ripeness theories is so important that courts should become more assiduous to recognize the advantages of" considering the two as part of a single inquiry).

On a motion to dismiss for lack of standing, we presume the general factual allegations embrace those facts necessary to support the claim, *see Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), and are constrained not only to accept the truth of the plaintiffs' jurisdictional allegations, but also to construe all reasonable inferences to be drawn from those allegations in plaintiffs' favor. *See Warth,* 422 U.S. at 501–02, 95 S.Ct. 2197; *Robinson v. Gov't of Malaysia,* 269 F.3d 133, 140 (2d Cir.2001).

A party bringing suit in federal court must establish standing to sue, that is, that the plaintiff is entitled to have a federal court decide the merits of his case. *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). Such jurisdiction may be invoked only when a plaintiff has suffered "threatened or actual injury" that results from a defendant's alleged illegal act. *Warth,* 422 U.S. at 499, 95 S.Ct. 2197. Standing doctrine delimits federal jurisdiction to, among other things, cases involving real injuries to plaintiffs, the so-called "injury-in-fact" requirement. That requirement is a recognition of the policy of the Constitution that the federal courts will not adjudicate hypothetical disputes—that "the legal questions presented to the court will be resolved ... in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley*

*Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Demonstrating injury in fact is thus one indicia that judicial power is not lightly being invoked.

[██] While not easy to define, injury in fact has widely been described as "an invasion of a legally protected interest which is (a) concrete and particularized" (*i.e.,* "affect[ing] the plaintiff in a personal and individual way"); and "(b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan,* 504 U.S. at 560 & n. 1, 112 S.Ct. 2130 (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). The plaintiffs must have "suffered some threatened or actual injury resulting from the putatively illegal action." *Warth,* 422 U.S. at 499, 95 S.Ct. 2197 (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). In the First Amendment context, allegations of a "subjective chill" of free speech rights will not suffice to satisfy the injury-in-fact requirement. *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). Rather, a plaintiff must demonstrate some specific present or future objective harm that the challenged regulation has inflicted by deterring him from engaging in protected activity. *Latino Officers Ass'n v. Safir,* 170 F.3d 167, 170 (2d Cir.1999).

LSC contends that because plaintiffs have not submitted a genuine proposal to form an affiliate or taken any action that would allow LSC to apply the program integrity rule to them, they have failed to demonstrate standing. This is in essence an argument that the dispute—and therefore the injury—is hypothetical. LSC believes that its decision to reject the clarified proposal could not establish injury in fact with respect to plaintiffs because the proposal was so far outside the scope of

what LSC would consider permissible that it was a means of presenting the same arguments to the district court that we had rejected as a facial matter in *Velazquez II*. Underlying LSC's view is the premise that its rejection of the clarified proposal did nothing to the plaintiffs except prevent them from forming affiliate organizations that the regulation already and patently prohibited.

That may or may not be the case. But the standing inquiry is not concerned with whether the clarified proposal violated the regulation; or even with whether the scope of that violation, if upheld, would effectuate a facial invalidation of the regulation. Such questions manifestly go to the merits of the plaintiffs' claim (that the clarified proposal is justified under the First Amendment regardless of the regulation), to which we will turn in a moment. The present question of standing, however, is resolved irrespective of the merits, for standing looks at "the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Thus, whether a plaintiff has standing will "depend[ ] considerably upon whether the plaintiff is himself an object of the [government action] at issue," and "[i]f he is, there is ordinarily little question that the action . . . has caused him injury." *Lujan*, 504 U.S. at 561–62, 112 S.Ct. 2130.

Here, in rejecting the clarified proposal, LSC, through its operation of the regulation, acted upon the plaintiffs by depriving them of the ability to form unrestricted affiliates and thereby to express their putative free speech rights without risking enforcement action by LSC. The rejection put plaintiffs to the choice of either forgoing the exercise of certain constitutional rights they believed they were entitled to, or risking the loss of LSC funding by doing what LSC expressly directed them not to do.

That is hardly a hypothetical injury. *See, e.g., Am. Booksellers Found. v. Dean*, 342 F.3d 96, 101 (2d Cir.2003) (finding standing because a statute "present[ed] plaintiffs with the choice of risking prosecution" or forgoing purportedly protected First Amendment activity); *Vt. Right to Life Comm. v. Sorrell*, 221 F.3d 376, 382 (2d Cir.2000) (noting fear of civil penalties can be as inhibiting of speech as facing threatened criminal prosecution, and finding standing). It is unreasonable to assume, as LSC would have us do, that if the plaintiffs actually formed the affiliates described in the proposal, LSC might take no action whatsoever against them, especially given its detailed and unequivocal rejection of the clarified proposal. *See Dean*, 342 F.3d at 101 (threshold for standing met by demonstrating "an actual and well-founded fear that the law will be enforced against" them); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement [but] . . . does not have to await the consummation of threatened injury to obtain preventive relief.").

Moreover, nothing in the record suggests the plaintiffs would meretriciously decline to form the affiliates they proposed in their clarified proposal, once LSC approved it. The clarified proposal as such, which is incorporated into the parties' stipulated facts, Stip. Facts ¶ 26, demonstrates its sincerity, and our review in favor of plaintiffs' allegations prevents us from questioning their motives. In any event, LSC does not seriously argue that the proposal is hypothetical because it lacks specificity, for the proposal is in fact specific. Rather, LSC contends the proposal

is hypothetical because it is facially invalid—meaning that LSC vigorously disagrees with it and believes upholding it would render the regulation a nullity. As noted above, however, this merits argument is unpersuasive because, in addition to being circular, it is irrelevant to the standing issue. We conclude therefore that the plaintiffs have standing to assert their as-applied challenge to the regulation.

## B. Merits

LSC next contends the district court applied the wrong legal test in its analysis of whether LSC's application of the regulation to plaintiffs violated the First Amendment. That court believed that we had adopted in *Velazquez II* a so-called "undue burden test" for such challenges. The trial court determined the content for that test—which *Velazquez II* did not provide, but which the district court found in Supreme Court precedent—to be "an intermediate form of review," a "balancing [of] the burdens imposed upon the plaintiff-grantees by LSC in the application of the program integrity rules, with its interests in doing so." *Velazquez v. Legal Servs. Corp. (Velazquez IV)*, 349 F.Supp.2d 566, 600 (E.D.N.Y.2004).

### 1. *Applicable Law*

As a preliminary matter, we point out that the controlling case in this Circuit for plaintiffs' challenge to the statute is *Velazquez II*, despite the difference of the as-applied posture. The instant as-applied challenge is, in all relevant respects, on all fours with its facial counterpart in *Velazquez II. See id.* at 574 (noting the as-applied challenge to LSC's program integrity rules "flow[s] from" the opening left by *Velazquez II* ).

Although the district court may have been under the impression that as-applied and facial challenges bear no relation to each other, *see, e.g., id.* at 599 ("[T]he Second Circuit's adoption of the undue burden standard was *dicta* since all that was before the court were facial challenges."); *id.* at 603 ("Initially, each of those cases only entailed facial challenges, invoking the restrictive constitutional principles applicable to such challenges."), this understanding is incorrect. Facial and as-applied challenges differ in *the extent to which* the invalidity of a statute need be demonstrated (facial, in all applications; as-applied, in a personal application). Invariant, however, is the *substantive rule of law* to be used. In other words, *how* one must demonstrate the statute's invalidity remains the same for both types of challenges, namely, by showing that a specific rule of law, usually a constitutional rule of law, invalidates the statute, whether in a personal application or to all. *See Nat'l Abortion Fed'n v. Gonzales*, 437 F.3d 278, 293–94 (2d Cir.2006) (Walker, C.J., concurring) ("Facial challenges . . . permit a single injured party to assert the claims of all future litigants by making a showing that each time that a statute is enforced, it will necessarily yield an unconstitutional result," but such challenges "provide[ ] no more relief than would be obtained over an exhaustive series of as-applied challenges"). *Velazquez II* supplied the rule of law for this appeal and the fact of this appeal's as-applied posture does nothing to alter that rule.

We also think it clear that *Velazquez II* controls with respect to the regulation despite the Supreme Court's decision in *Velazquez III. Velazquez III* was a review of a part of our *Velazquez II* judgment entirely unrelated to our discussion of the regulation. Moreover, the Supreme Court denied the *Velazquez* plaintiffs' petition for writ of certiorari concerning the regulation a few days after deciding *Velazquez III*,

but significantly did not vacate and remand our judgment with respect to the regulation for reconsideration in light of *Velazquez III*. In short, *Velazquez II* remains good law and controls this appeal.

### 2. *Analysis*

■■■ With that in mind, we think the district court's adoption and subsequent application of a separate undue burden test were error. First, the district court misread our decision in *Velazquez II*. As that court itself recognized, the statement that application of the regulation may, "in the case of some recipients, prove unduly burdensome," 164 F.3d at 767, was pure dictum. More importantly, the statement did not purport to set forth a legal rule governing challenges to the regulation—a fact the district court apparently recognized, but ultimately ignored, when it observed that we cited no legal "authority for this *dicta*," *Velazquez IV*, 349 F.Supp.2d at 599. It is difficult to conceive of our establishing a legal rule to govern future cases yet expressing neither intention nor rationale for doing so, not to mention citation to a single legal authority. *See CBS, Inc. v. Am. Soc'y of Composers, Authors & Publishers*, 620 F.2d 930, 935 (2d Cir.1980) ("[A]ppellate courts, endeavoring to rule beyond the precise holding of a case, normally make [their intention to afford value to dictum] unmistakably clear.").

Doubtless the undue burden language was a more appealing candidate for divining a legal standard than the other plentiful dicta in *Velazquez II* because "undue burden" is a term of art, retaining a substantive meaning articulated by the Supreme Court independent of its dictionary meaning, *see Velazquez IV*, 349 F.Supp.2d at 598–603 (discussing the legal background of the test). But the *availability* of guidance from this Court or the Supreme Court regarding a particular legal standard is not a reason for choosing that standard. That is rather like choosing a chainsaw to perform delicate surgery because it comes with an extensive user's manual.

As described above, nothing in our discussion in *Velazquez II* suggests adoption of a separate test. And, even if the absence in *Velazquez II* of an intention "to rule beyond the precise holding of [the] case," *CBS*, 620 F.2d at 935, was insufficient to warrant caution in adopting the undue burden test, the trial court's review of the case law should have convinced it that reliance on the test would be misplaced. The lines of cases articulating the undue burden test and analyzed by the district court concern the direct regulation of conduct in the contexts of the Commerce Clause, abortion, and voting rights, but plainly not the First Amendment. *See Velazquez IV*, 349 F.Supp.2d at 601–02.

Second, in addition to misreading *Velazquez II*, the district court focused its analysis too heavily upon LSC's asserted interests in imposing the physical separation requirement of the regulation. *See Velazquez IV*, 349 F.Supp.2d at 607–10. The trial court believed LSC's interests, which it boiled down to the interests against federal funds intermingling with non-federal funds and the appearance of governmental endorsement of restricted activities, could be fulfilled by means less restrictive than the regulation's requirement of physical separation. We cannot adopt this view for several reasons.

LSC's and the federal government's interests in these cases cannot be subject to the least- or less-restrictive-means mode of analysis—which, like the undue burden test itself, is more appropriate for assessing the government's direct regulation of a fundamental right—when the government creates a federal spending program. *See United States v. Am. Library Ass'n*, 539

U.S. 194, 211–12, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003); *cf. South Dakota v. Dole,* 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (courts should defer to the judgment of Congress in considering whether its exercise of the spending power is intended for the general welfare). This is so because while the First Amendment has application in the subsidy context, the government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech at stake. *Nat'l Endowment for the Arts v. Finley,* 524 U.S. 569, 587–88, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998). That is to say, Congress may through funding encourage a program in the public interest without being required to fund an alternative program. "So long as legislation does not infringe on other constitutionally protected rights, Congress has wide latitude to set spending priorities." *Id.* at 588, 118 S.Ct. 2168. Here, far from granting Congress wide latitude to set spending priorities, the district court's application of the less-restrictive-means analysis essentially demanded the government provide a compelling interest for the regulation—a demand more appropriate for the strict scrutiny analysis that was rejected in *Velazquez II* and not used in the government subsidies cases we found relevant there. *See Velazquez II,* 164 F.3d at 765–67.

To be sure, the government's interests are not completely irrelevant. *See, e.g., Rust,* 500 U.S. at 199, 111 S.Ct. 1759 (disclaiming the view that "funding by the Government . . . is invariably sufficient to justify Government control over the content of expression"); *Regan v. Taxation With Representation (TWR),* 461 U.S. 540, 544 n. 6, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (leaving open the question whether "requirements that are unrelated to the congressional purpose" which "effectively make it impossible" for a restricted

organization to establish an unrestricted affiliate are constitutional); *Velazquez II,* 164 F.3d at 766 (program integrity rules do not necessarily allow adequate avenues for protected expression "where the relationship between the burden and the government benefit may be more attenuated"). When the government's interests are so attenuated from the benefit condition as to amount to a pretextual device for suppressing dangerous ideas or driving certain viewpoints from the marketplace, then relief may indeed be appropriate. *See Finley,* 524 U.S. at 587, 118 S.Ct. 2168. And, as we observed in *Velazquez II,* some of the 1996 Act's restrictions are directed toward speech on the "highest rung" of First Amendment values, requiring perhaps our closer attention. *See* 164 F.3d at 771 (hypothesizing that the Supreme Court would not tolerate a regulation "authoriz[ing] grants funding support for, but barring criticism of, governmental policy"). But that issue goes to the 1996 Act's substantive restrictions that are directed toward speech as such—for example, the statutory restrictions challenged in these cases. The program integrity regulation, by contrast, is not directed toward speech but toward ensuring the fulfillment of Congress' spending priorities, *see* 45 C.F.R. § 1610.1, and the fact that it requires LSC-fund recipients to expend their own funds to obtain a governmental subsidy cannot effect a *per se* invalidation of the operative regulation.

More fundamentally, upholding the mode of analysis utilized by the district court—balancing the plaintiffs' interests against those of the government—would wipe out the bulk of the regulation's applications and effectively invalidate it on its face, thus making the district court's ruling contrary to the holding in *Velazquez II* which upheld the regulation's facial validity. The district court's reasoning renders

meaningless our statement that it appeared "*likely* that LSC grantees *with substantial non-federal funding* can provide the full range of restricted activity through separately incorporated affiliates without serious difficulty," *Velazquez II*, 164 F.3d at 767 (emphasis added), because even an entity with unlimited private funds under the district court's rationale need not satisfy the regulation's physical separation requirements since less restrictive means of achieving LSC's interests exist. It is noteworthy that the Supreme Court in Rust apparently was not concerned that the Department of Health and Human Services's program integrity regulation, upon which LSC's regulation is modeled, "required a certain degree of separation ... in order to ensure the integrity of the federally funded program." 500 U.S. at 198, 111 S.Ct. 1759. And citing *FCC v. League of Women Voters*, 468 U.S. 364, 400, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), the Supreme Court rejected the argument that the regulation violates the First Amendment by penalizing speech funded with non-federal money by requiring that recipients of grants help finance federally funded projects by using matching non-federal funds. *See Rust*, 500 U.S. at 199 n. 5, 111 S.Ct. 1759. Our holding in *Velazquez II*, unlike the district court's below, was consistent with this view.

Thus, the district court, with its focus on the undue burden dictum of *Velazquez II*, perhaps forgetfully lost sight of the true significance of that case: its description of the relevant legal framework for addressing First Amendment challenges to the regulation. Not only did we state in *Velazquez II* the governing law for these sorts of challenges; we applied it to this very regulation. As a consequence, the district court, instead of mistakenly working from what it perceived was a blank slate of applicable law, should have followed the clear tracks we left in *Velazquez II*.

In *Velazquez II*, we upheld the validity of the program integrity regulation under the rubric of "unconstitutional conditions," 164 F.3d at 765. Our statement of the legal framework for First Amendment challenges to the regulation was explicit: "Three Supreme Court cases provide the framework for evaluating plaintiffs' unconstitutional conditions claim." *Id.* Those cases, *TWR*, *League of Women Voters*, and *Rust*, like this appeal, dealt with the difficult problem of government subsidies and whether restrictions on speech accompanying the subsidy were permissible. Our analysis of those cases was thorough and need not be repeated here, and it resulted in a plain and specific standard: "Taking [*TWR*, *League of Women Voters*, and *Rust* ] together, we infer that, in appropriate circumstances, Congress may burden the First Amendment rights of recipients of government benefits *if the recipients are left with adequate alternative channels for protected expression.*" *Id.* at 766 (emphasis added). Addressing the facial challenge, *Velazquez II* essentially answered the antecedent clause of the standard in the affirmative. Congress may burden the First Amendment rights of the plaintiffs pursuant to the regulation. At issue in these cases is the second clause, whether the plaintiffs have demonstrated as a factual matter that the regulation has not left them adequate alternative channels for protected expression. The district court is in a better position to make this fact determination, and we leave it to that court to do so in the first instance utilizing the correct standard.

Nevertheless, aware that the standard articulated in *Velazquez II* might seem too general or even opaque, we point out that *Velazquez II* did not simply state the standard and leave it at that; it also elaborated

a relatively detailed description of the sort of restrictions with respect to the regulation that might fail to provide adequate alternative channels for protected expression. For instance, we considered the allegations, "on the sparse record before [us]," that the regulation's physical separation requirements were unconstitutional because they imposed extraordinary burdens that impede grantees from exercising their First Amendment rights, created prohibitive costs of compliance, and demanded an unjustifiable degree of separation of affiliates. *Id.* at 767. All of these allegations we rejected, but not on the ground that they were illegitimate as a matter of law; rather, we said that the record before us did not establish them as a matter of fact, since there was "little evidence to support . . . predictions regarding how seriously the [regulations] will affect grantees generally." *Id.* It follows, then, that were the plaintiffs able to prove their allegations as a matter of fact, they might have sustained their challenge as applied under the adequate alternative channels test, though obviously no single factor will be dispositive.

At the same time, recognizing that "[a]ppellate guidance is not valueless because it is dictum," *CBS, Inc.*, 620 F.2d at 935, we do not ignore the undue burden language of *Velazquez II*. Acknowledging that the regulation may prove especially burdensome in the context of legal services, the *Velazquez II* Court said that if it "in fact unduly burden[ed] [the plaintiffs'] capacity to engage in protected First Amendment activity" the as-applied challenge might be sustained. 164 F.3d at 767. That was not, as discussed above, the adoption of an altogether different legal test from the one we had articulated just a few paragraphs earlier concerning adequate alternative channels. Rather, it was an invitation for the district court to use its judgment under the adequate alternative channel test. *Velazquez II's* pronouncement should be

taken at face value. There we articulated that restrictions that unduly burden the ability of an organization to set up adequate alternative channels for protected expression such that they are in effect precluded from doing so should be subject to invalidation. *See id.* at 766. Substantially burdening an organization's ability to set up an affiliate violates the standard in *Velazquez II* that require not simply the existence of an alternative channel but the existence of an "adequate" one. By definition, an alternative is inadequate if the government substantially or unduly burdens the ability to create the alternative. This conclusion is reflected in Supreme Court precedent addressing the very context with which we are confronted, namely government restrictions on speech accompanying subsidies. *See TWR*, 461 U.S. at 544 n. 6, 103 S.Ct. 1997; *cf. Am. Library Ass'n*, 539 U.S. at 215, 123 S.Ct. 2297 (Kennedy, J., concurring) (Because plaintiffs failed to show that adult library users' access to protected material was burdened in any significant degree, the statute is not unconstitutional on its face. However, if "an adult user's election to view constitutionally protected Internet material is burdened in some other substantial way, that would be the subject for an as-applied challenge," not a facial one.).

It is our role to ensure that in making factual findings, the district court applies the proper legal test and applies it correctly. That was not done. Here, the district court's deviation from the adequate alternative test articulated in *Velazquez II* was error. The district court fashioned an "undue burden" test out of whole cloth from unrelated case law concerning abortion, commerce, and ballot access rights. *See Velazquez IV*, 349 F.Supp.2d at 601–02. It should have used the adequate alternative test we articulated in *Velazquez II* and considered whether the potential

alternative channels were adequate in light of burdens imposed. In *Velazquez IV*, the district court set out three specific burdens which could inform this decision, specifically, (1) financial, (2) programmatic, and (3) administrative, only to disregard them in reaching its conclusion. 349 F.Supp.2d at 604–05. After carefully detailing the annual budget and estimated cost of establishing an affiliate, i.e., an alternative channel, for each of three LSC grantees, the district court stopped its analysis of the burdens imposed. *See id.* at 605–07. It failed to analyze any specific financial or other burden in reaching its conclusion, and instead simply discussed the government's competing interests. *See id.* at 607. On remand, the district court should make factual findings under the adequate alternative test articulated in *Velazquez II* and consider whether the associated burdens in effect preclude the plaintiffs from establishing an affiliate. If so, the alternative channels are inadequate, and the plaintiffs may prevail on their as-applied challenge.

## II   Regulation: Establishment Clause Claim

As an alternative ground for upholding the preliminary injunction, plaintiffs maintain on cross-appeal that the program integrity regulation is facially unconstitutional under the Establishment Clause of the First Amendment because it discriminates against secular speech. As evidence of the discriminatory nature of the regulation, plaintiffs point to the level of separation required for similarly-situated religious organizations by the President's so-called faith-based initiative. *See, e.g.,* Equal Protection of the Laws for Faith–Based and Cmty. Organizations, Exec. Order No. 13,-279, 67 Fed.Reg. 77,141 (Dec. 12, 2002). The faith-based initiative requires religious organizations receiving federal funds to conduct their religious activities "separately in time or location from any programs or services supported with direct Federal financial assistance." *Id.* at 77,142. But, plaintiffs declare, the faith-based initiative order does not demand the degree of separation required by the program integrity regulation. Significantly, plaintiffs do not directly challenge the separation requirements of the initiative, which in any event are not before us, but they believe the situation discriminatory and violative of the Establishment Clause.

█ This assertion fails inasmuch as its premise is flawed. The program integrity regulation does not discriminate against secular speech, nor does it favor religious speech. The religious organizations that are similarly situated to the plaintiffs and wish to receive LSC funding must also comply with the regulation's requirement of physical and financial separation from their affiliates engaging in restricted activities. *See, e.g.,* 42 U.S.C. §§ 604a(h)(1) & 9920(d)(1); White House Office of Faith–Based and Cmty. Initiatives, *Guidance to Faith–Based and Cmty. Orgs. on Partnering with the Fed. Gov't* 15 (2003) (*also available at,* http://www.whitehouse.gov/government/fbci/guidance/index.html) ("Faith-based organizations that receive Federal funding are held to the same standards as all other providers of services.").

At bottom, plaintiffs believe that any governmental effort to accommodate a religious organization "impermissibly advanc[es] religion by giving greater protection to religious rights than to other constitutionally protected rights." *Cutter v. Wilkinson,* 544 U.S. 709, 724, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). Leaving aside the Supreme Court's rejection of this proposition just last year in *Cutter, see id.* at 724–25, 125 S.Ct. 2113; *see also Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v.*

*Amos,* 483 U.S. 327, 334–35, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987), we cannot adopt a view that Congress' decision to accommodate a religious organization in the distribution of its funds must by mandate of the Establishment Clause level the field for all other restrictions the government may place on totally unrelated programs.

### III  Tenth Amendment Claim

Further, plaintiffs contend on cross-appeal that the 1996 Act and the program integrity regulation are unconstitutional because they violate the Tenth Amendment and fundamental principles of federalism. The Tenth Amendment provides, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Reasoning that the LSC restrictions interfere with the states' ability to fund legal assistance programs that receive LSC funds and perform important functions on behalf of state judicial systems, plaintiffs insist that by this Congress intruded unacceptably on state sovereignty. The merits of this claim cannot be decided at this time, however, *see Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 93–94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (requiring jurisdictional issues be addressed prior to the merits), for it is apparent plaintiffs lack standing to assert it.

In *Tenn. Elec. Power Co. v. Tenn. Valley Auth.,* 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939), state-chartered utility companies contended that the sale of electrical power by a federally-chartered corporation, the Tennessee Valley Authority, amounted to federal regulation of purely local matters in violation of the Tenth Amendment, because the federal sales drove down electricity prices, thus indirectly regulating the companies' rates. *Id.*

at 143, 59 S.Ct. 366. The Supreme Court, in rejecting this argument, observed that by contracting with state municipalities concerning electricity, the federal corporation was not regulating prices but "seeking and assuring a market for the power which the Authority has for sale, and a lawful means to that end." *Id.* at 144, 59 S.Ct. 366. The Court continued

> The sale of government property in competition with others is not a violation of the Tenth Amendment. As we have seen there is no objection to the Authority's operations by the states, and, if this were not so, the appellants, absent the states or their officers, have no standing in this suit to raise any question under the [Tenth] [A]mendment.

*Id.*

[■] In this appeal, the requisite representation by the states or their officers is notably absent. The plaintiffs to this litigation—including the various government-donor plaintiffs who have sought to provide public non-federal funding to LSC-funded recipient programs—have brought suit against LSC in their personal, not official, capacities; that is, no plaintiff in this litigation represents a state or its instrumentality. Velazquez Compl. ¶¶ 10 & 16; *see Karcher v. May,* 484 U.S. 72, 77–78, 108 S.Ct. 388, 98 L.Ed.2d 327 (1987); *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 543–44, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). The Supreme Court's determination that the plaintiffs under these circumstances have no standing ends our inquiry.

The district court thus erred when it held that some of the plaintiffs had standing to assert rights under the Tenth Amendment, departing from the Supreme Court's ruling in *Tenn. Elec. See Velazquez IV,* 349 F.Supp.2d at 581–83. The trial court disregarded the ruling for two reasons. First, examining *Tenn. Elec.,* it

found the Supreme Court's passing comment regarding Tenth Amendment standing was dicta since the Supreme Court reached the merits. *Id.* at 581–82. Second, relying principally on a case from another circuit, the trial court believed *Tenn. Elec.'s* binding authority was in any event greatly diminished by *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). *See Velazquez IV,* 349 F.Supp.2d at 582. In *New York,* responding to the argument that a federal statute cannot be an unconstitutional infringement of state sovereignty when state officials have consented to the statute's enactment, the Supreme Court said

The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals.

505 U.S. at 181, 112 S.Ct. 2408. The district found this statement persuasive evidence that *Tenn. Elec.* was not controlling law because it established that the Tenth Amendment was designed to protect individual rights rather than the states' rights, thus conferring standing upon private individuals. *See Velazquez IV,* 349 F.Supp.2d at 582. However, both rationales are inapt and neither justifies departing from *Tenn. Elec.*

It is not clear that *Tenn. Elec.'s* statement regarding Tenth Amendment standing was dictum. The Supreme Court's holding, that the Authority's sale of electricity did not violate the Tenth Amendment, could be based either upon the merits-based reasoning the Court expressed just prior to the holding (the thrust of which was that the federal corporation was not regulating anything, much less matters of purely local concern), or upon the standing-based reasoning that immediately follows (contemplating only states have standing under the Constitution to assert a Tenth Amendment claim). Where the standing question concerns the constitutional jurisdiction of a federal court, however, the judgment on the jurisdictional issue predominates and is antecedent to any discussion of the merits, rendering the merits-based reasoning dicta. *See Steel Co.,* 523 U.S. at 94–95, 118 S.Ct. 1003. For "[w]ithout jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.* at 94, 118 S.Ct. 1003 (quoting *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868)).

Thus, contrary to the district court's belief, *Tenn. Elec.'s* standing-based reasoning was not dicta but instead essential to its holding and thus binding. Moreover, even assuming *arguendo* that the standing-based reasoning did not supersede the merits-based reasoning, where two independent rationales support a decision by the Supreme Court, neither can be considered dictum, and each represents a valid holding of the Court. *See Medeiros v. Vincent,* 431 F.3d 25, 34 (1st Cir.2005) (applying this rule to *Tenn. Elec.'s* Tenth Amendment holding). Accordingly, the holding of the *Tenn. Elec.* Court, that is, its power to bind lower federal courts, was based upon the standing rationale, which this Court must follow. *Cf.* 18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4421 (2d ed. 2002) ("A court that admits its own lack of power to decide [the merits] should not undertake to bind a court that does have power to decide" the merits).

Further, *New York* does not support overruling *Tenn. Elec.* The issue of Tenth Amendment standing is not even indirectly addressed in *New York.* As the First Circuit observed, neither *Tenn. Elec.* nor standing is discussed in that case. *See Medeiros,* 431 F.3d at 34. The quoted passage upon which the district court relied concerns the *states'* ability to *waive* Tenth Amendment violations and has nothing to do with standing. We recognize that construing *New York* to diminish the weight of *Tenn. Elec.'s* reasoning is one possible reading of the case, *see, e.g., Gillespie v. City of Indianapolis,* 185 F.3d 693, 703–04 (7th Cir.1999), but the federal courts have come to no settled consensus on the issue, *see Medeiros,* 431 F.3d at 35–36 (collecting and discussing cases reaching conflicting conclusions with respect to Tenth Amendment standing); *cf. Pierce County, Wash. v. Guillen,* 537 U.S. 129, 148 n. 10, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003) (declining to address the certiorari-granted question whether private plaintiffs have standing to assert a claim under the Tenth Amendment). *But cf. Flast,* 392 U.S. at 105, 88 S.Ct. 1942 (implying that private individuals may *not* assert the states' interest in their legislative prerogatives). We are nonetheless bound by the rule that "[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *Tenet v. Doe,* 544 U.S. 1, 10–11, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005).

In sum, *Tenn. Elec.* here controls, and the district court erred by ruling otherwise and by failing to dismiss the plaintiffs' Tenth Amendment claim pursuant to Rule 12(b)(1) for lack of standing.

## IV

Finally, we reject the plaintiffs' challenge to the facial validity of the 1996 Act's restrictions on class actions, attorneys' fees, and in-person solicitation of clients, *see* 1996 Act § 504(a)(7), (13), & (18); 45 C.F.R. pts. 1617, 1638, & 1642. We refer the reader to the district court's thorough analysis of the law and the facts to this challenge. *See Velazquez IV,* 349 F.Supp.2d at 585–98. That analysis convincingly demonstrates that plaintiffs' arguments (consisting of a mere five pages in their 85–page brief) regarding the statutory restrictions are without merit. We concur in that discussion.

## CONCLUSION

Because our disposition of this appeal requires the district court to consider anew on remand the as-applied challenge to the program integrity regulation, we need not address whether the court erred by fashioning the injunction to require recipient programs to maintain physically separate public areas and program attorneys to withdraw their representation of a client upon discovering a restricted component in a case.

Accordingly, the district court's partial grant of the preliminary injunction is hereby vacated. Its order granting in part and denying in part LSC's motion to dismiss plaintiffs' Tenth Amendment challenge for lack of standing is also vacated, with instructions to grant the motion in toto. In all other respects the orders of the district court are affirmed, and the matter is remanded for further proceedings consistent with this opinion.